**United States District Court**

**For the Northern District of California**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE GRAND JURY SUBPOENAS TO MARK FAINARU-WADA and LANCE WILLIAMS | No. CR 06-90225 JSW<br><br>**ORDER DENYING MOTION TO QUASH SUBPOENAS** |
| _____ / | |

## INTRODUCTION

This matter comes before the Court upon consideration of the motion to quash subpoenas filed by Mark Fainaru-Wada ("Fainaru-Wada") and Lance Williams ("Williams") (collectively "Movants"). Having considered the parties' pleadings, the brief filed by Amicus Curiae,[1] relevant legal authority, and having had the benefit of oral argument, the Court HEREBY DENIES the motion to quash.[2]

---

[1] The amicus brief was filed by ABC, Inc., American Society of Newspaper Editors, The Associated Press, *The Bakersfield Californian*, Belo Corp., Cable News Network LP, LLLP, California Newspaper Publishers Association, CBS Broadcasting, Inc., Dow Jones & Company, Inc., DR Partners d/b/a Stephens Media Group, The E.W. Scripps Company, Freedom Communications, Inc., Gannett Co., Inc., *Los Angeles Times*, The New York Times Company, Newspaper Association of America, Newsweek, Inc., *The Oregonian*, The Radio-Television News Directors Association, The Reporters Committee for Freedom of the Press, Reuters America LLC, *The San-Diego Union Tribune*, the Society of Professional Journalists, Time Inc., and The Washington Post Company.

[2] The parties' pleadings include the motion to quash and memorandum of law in support of thereof, three volumes of affidavits and exhibits in support of the motion, the Government's memorandum of law in opposition, the declaration of Brian Hershman in

## BACKGROUND

This case arises out of a series of articles published in the *San Francisco Chronicle* (the "*Chronicle*"), authored by movants Mark Fainaru-Wada ("Fainaru-Wada") and Lance Williams ("Williams") (collectively "Movants"). The articles relate to the Bay Area Laboratory Co-Operative ("BALCO"), its principals, and two of its distributors (the "BALCO defendants"), and the Government's investigation into the distribution of steroids and performance enhancing drugs to a number of prominent athletes. (*See generally,* Affidavit of Jonathan R. Donnellan ("Donnellan Aff."), Exs. 1-11, 26-30, 32.)[3] Movants began reporting on the BALCO investigation in or around October 2003. (Donnellan Aff., Ex. 1.)

On February 12, 2004, the BALCO defendants were indicted and charged with, *inter alia*, conspiracy to distribute and possess with intent to distribute anabolic steroids, and possession with intent to distribute anabolic steroids and the aiding and abetting thereof. (*Id.*, Ex. 16.) On February 27, 2004, Judge Illston, the presiding judge in the BALCO case, held a trial setting conference. At that conference, the Government turned over approximately 2,000 pages of grand jury transcripts on the condition that the transcripts would be subject to a protective order. (Declaration of Brian D. Hershman ("Hershman Decl."), Ex. A at 5:18-6:20.) On March 8, 2004, Judge Illston approved the Stipulated Protective Order (the "Protective Order") submitted by the parties. Under the terms of that Protective Order, the parties were precluded from disseminating to the press any "Sealed Material," the definition of which specifically included grand jury transcripts. (Donnellan Aff., Ex. 23 (Protective Order, ¶¶ 1.a, 2, 3).) The Protective Order provided that a violation "may be punishable by contempt of court, whatever other sanction the Court deems just, and/or any other sanctions which are legally

---

support of the Government's opposition, Movants' reply, the Declaration of Eve Burton in support of the reply, the Government's sur-reply, the publicly filed exhibit to the sur-reply, the Declaration of Brian Hershman in support of the sur-reply and an exhibit thereto, which were submitted *ex parte* and in camera, and Movant's response to the Government's sur-reply.

[3] Movants have been employed by the *Chronicle* as investigative reporters for approximately six years. (Affidavit of Mark Fainaru-Wada ("Fainaru-Wada Aff."), ¶¶ 1, 3; Affidavit of Lance Williams ("Williams Aff."), ¶¶ 1-3.) Fainaru-Wada has worked as a journalist for more than twenty years. Williams has worked as journalist for more than thirty years. (Fainaru-Wada Aff., ¶ 3; Williams Aff., ¶ 3.)

available." (*Id.*, ¶ 7.) The grand jury transcripts also would have been subject to the secrecy provisions of Federal Rule of Criminal Procedure 6(e).[4]

On June 23, 2004, the *Chronicle* published articles, authored by Movants, reporting on and quoting testimony given to the grand jury during the course of the BALCO investigation. (Donnellan Aff., Exs. 26-27.) In July 2004, the parties in the BALCO case submitted declarations to Judge Illston regarding their handling of the grand jury transcripts. (Hershman Decl., Ex. AA.) According to Movants, in the summer and fall of 2004, the Government asked them to disclose voluntarily "confidential source information and material related to [their] investigation of BALCO." (*See* Fainaru-Wada Aff., ¶ 10; Williams Aff., ¶ 12.) Movants declined to do so. (*Id.*)

On December 2 and 3, 2004, Movants again authored and published articles reporting on and quoting grand jury testimony from the BALCO investigation. (Donnellan Aff., Exs. 28-30.) Movants attest that they used confidential sources, as they have done during the course of their careers, to write each of the articles in which they disclosed grand jury testimony. Movants also attest to the important part they believe confidential sources play in their roles as journalists. (Fainaru-Wada Aff., ¶¶ 5-7; Williams Aff., ¶¶ 5-9.)

On December 3, 2004, Judge Illston issued a notice to the parties that the matter of the leaks of grand jury transcripts had been referred to the United States Department of Justice "for investigation, either internally or if necessary through independent counsel, to determine the source of the disclosures." (Donnellan Aff., Ex. 75.)

On April 19, 2006, in the course of that investigation, the Government issued subpoenas requiring Movants to appear before the grand jury and to produce documents regarding the source of the grand jury transcripts disclosed in the articles. (*Id.*, Exs. 77, 78.) According to Movants, they received these subpoenas on or about May 5, 2006. (Fainaru-Wada Aff., ¶ 10; Williams Aff., ¶ 12.) Movants filed the instant motion to quash on May 31, 2006.

---

[4]  Federal Rule of Criminal Procedure 6(e)(6), for example, provides that "[r]ecords, orders, and subpoenas relating to grand jury proceedings must be kept under seal to the extent and as long as necessary to prevent the unauthorized disclosure of a matter occurring before a grand jury." A knowing violation of Rule 6 "may be punished by contempt of court." Fed. R. Crim. P. 6(e)(7).

3

In addition to the facts recounted by the Court above, Movants submit affidavits from a number of journalists who also attest to the important role that confidential sources play in their news coverage. (*See* Affidavits of Carl Bernstein and Jack Nelson.) Movants further submit affidavits from parents whose children have committed suicide apparently as a result of steroid usage. (*See* Affidavits of Denise A. Garibaldi, Ph.D. and Donald Hooton.) Finally, Movants submit numerous articles, transcripts from televisions shows, and legislation that has been introduced and passed regarding steroid usage, to demonstrate the response to their articles and to demonstrate that the articles heightened public interest and awareness of the issue of steroid use and abuse. (*See, e.g.,* Donnellan Aff., Exs. 13-15, 24-25, 33-73; *see also* Affidavits of Roger Blake, Congressman John E. Sweeney, Francis Vincent, Jr., and Gary Wadler, M.D.) The Government, in turn, submits evidence regarding its investigation into the leaks and its efforts to obtain this information from sources other than the Movants. (Hershman Decl., Ex. EE-GG; Hershman Reply Declaration, Ex. 1.)

The Court does not intend to discount any of this evidence by not addressing it more specifically in this Order and has considered it carefully in reaching its conclusions. However, it intends its analysis to focus on the legal issue presented - namely whether or not Movants are entitled to withhold the identity or identities of their confidential source or sources. Additional facts necessary to the analysis are set forth in the remainder of this Order.

## ANALYSIS

At the outset, the Court reiterates its views, as expressed at the hearing, that both parties' arguments raise important policy considerations and concerns. On one side is the role that members of the press play in bringing issues to the forefront of public attention, which may lead to changes in policy or the law.

> The First Amendment protections for the press embodied in [the First] Amendment are designed to "preserve an untrammeled press as a vital source of public information," *Grosjean v. Am. Press Co.*, 297 U.S. 233, 250 (1936), ensuring that the press "could bare the secrets of government and inform the people," *New York Times Co. v. United States*, 403 U.S. 713, 717 (1971) (Black, J., concurring). As the Supreme Court recognized in *New York Times v. Sullivan*, 376 U.S. 254, 270 (1964), there is "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open."

*United States v. Libby*, 432 F. Supp. 2d 26, 43 (D.D.C. 2006). Indeed, the Supreme Court has noted that "the free press has been a mighty catalyst in awakening public interest in governmental affairs, exposing corruption among public officers and employees and generally informing the citizenry of public events and occurrences ... ." *Estes v. Texas*, 381 U.S. 532, 539 (1965). Without question, confidential sources often are essential in assisting the press in that task. However, the "the First Amendment does not invalidate every incidental burdening of the press that may result from the enforcement of civil or criminal statutes of general applicability." *Branzburg v. Hayes*, 408 U.S. 665, 682 (1972).

On the other side is the role that the grand jury, and its concomitant rules of secrecy, play in our criminal justice system. The grand jury

> is an investigatory body charged with the responsibility of determining whether or not a crime has been committed. Unlike this Court, whose jurisdiction is predicated on a specific case or controversy, the grand jury "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." The function of the grand jury is to inquire into all information that might possibly bear on its investigation until it has identified an offense or has satisfied itself that none has occurred. As a necessary consequence of its investigatory function, the grand jury paints with a broad brush. "A grand jury investigation 'is not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed.'"

*United States v. R. Enterprises*, 498 U.S. 292, 297 (1991) (emphasis added) (citations omitted). However, "[t]he investigatory powers of the grand jury are nevertheless not unlimited. ... Grand juries are not licensed to engage in arbitrary fishing expeditions, nor may they select targets of investigation out of malice or an intent to harass." *Id.* (citations omitted).

The Court finds itself bound by the law governing this case to subordinate Movants' interests to the interests of the grand jury. Further, on the facts presented, even if a federal common law reporter's privilege existed, the Court concludes that the Government has satisfied its burden to overcome the assertion of any such privilege.

**A.  The Movants Cannot Rely on a First Amendment Reporter's Privilege to Resist the Subpoenas.**

Movants argue that the Court should quash the subpoenas because "it is well-established within this Circuit that the First Amendment provides reporters with a qualified reporter's privilege." (Mot. at 31.) The Court finds the cases on which Movants rely for this proposition, *Shoen v. Shoen*, 48 F.3d 412 (9th Cir. 1995) ("*Shoen II*"), *Shoen v. Shoen*, 5 F.3d 1289 (9th Cir. 1993), *United States v. Pretzinger*, 542 F.2d 517 (9th Cir. 1976), and *Farr v. Pritchess*, 522 F.2d 464 (9th Cir. 1975), to be inapposite because those cases do not involve grand jury proceedings.[5] *See In re Grand Jury Proceedings (Scarce)*, 5 F.3d 397, 402 (9th Cir. 1993) (distinguishing *Farr* and noting that the *Farr* court "balanced the conflicting interests raised by that case where the societal interest was different in order to determine the existence of a privilege, but did so only because that case - unlike *Branzburg* or the present case - did not involve testimony before a grand jury") (hereinafter "*Scarce*").

Rather, the holdings of *Branzburg* and *Scarce*, are controlling and require the Court to reject Movants' assertion of a First Amendment reporter's privilege. In *Branzburg,* the Supreme Court consolidated four cases for decision in which reporters, like Movants in this case, were called upon to testify before grand juries to provide information about persons or groups to whom they had promised confidentiality. Each of the reporters urged the Supreme Court to adopt a qualified privilege grounded in the First Amendment. *Branzburg*, 408 U.S. at

---

[5] Of the four cases, *Farr* is the most analogous to the factual circumstances presented by this case. In *Farr*, a trial court issued an order precluding the parties from disseminating certain information to the public, ostensibly to protect the defendants' right to a fair trial. Farr, a reporter, obtained and published information that was covered by the order. *Farr*, 522 F.2d at 466. After the criminal trial had concluded, the trial court ordered Farr to divulge his source and when Farr refused, held him in contempt.

Movants in this case argue, with respect to the balancing test they advocate, that because the BALCO criminal case has concluded, there is no real need for disclosure of their source or sources. In *Farr*, however, the Ninth Circuit affirmed the denial of Farr's federal habeas petition, concluding that any First Amendment protection Farr could have been afforded was outweighed by "the power of the court to enforce its duty and obligation relative to the guarantee of due process to the defendants in the on-going trial," *notwithstanding the fact that the trial had concluded* by the time Farr was ordered to disclose his source. *See Farr*, 522 F.3d at 469. Thus, although it does not involve a grand jury proceeding, *Farr* supports the Court's conclusion that Movants are not privileged under the First Amendment from disclosing their source or sources.

6

680. The Supreme Court's response was succinct: "We are asked to create another [privilege] by interpreting the First Amendment to grant newsmen a testimonial privilege that other citizens do not enjoy. This we decline to do." *Id.* at 689.

This Court cannot conclude that this statement does not mean exactly what it says, namely that "the First Amendment does not provide a news gatherer a privilege to refuse to testify before a federal grand jury regarding information received in confidence." *Scarce*, 5 F.3d at 400; *see also Cohen v. Cowles Media Co.*, 501 U.S. 663, 669 (1991) ("Neither does the First Amendment relieve a newspaper reporter of the obligation shared by all citizens to respond to a grand jury subpoena and answer questions relevant to a criminal investigation, even though the reporter might be required to reveal a confidential source.") (citing *Branzburg*, 408 U.S. 665). To date, the Supreme Court has not overruled *Branzburg*. Thus, the Court is bound by that opinion, and it is not the only court to reach this conclusion. *See, e.g., New York Times Co. v. Gonzales*, __ F.3d __, 2006 WL 3130645 at *11-12 (2d Cir. Aug. 1, 2006) ("*Gonzales*"); *In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141, 1145-1149 (D.C. Cir. 2006); *In re Special Proceedings*, 373 F.3d 37, 44-45 (1st Cir. 2004) (holding *Branzburg* precluded recognition of First Amendment reporter's privilege "even though we are dealing with a special prosecutor rather than a grand jury"); *In re Special Counsel Investigation*, 332 F. Supp. 2d 26, 27-32 (D.D.C. 2004); *Lewis v. United States*, 517 F.2d 236, 237-38 (9th Cir. 1975) ("The holding of *Branzburg* ... is that the first amendment does not afford a reporter a privilege to refuse to testify before a federal grand jury as to information received in confidence.")

This Court believes *Branzburg*'s holding is clear. However, Justice Powell, who joined in the majority opinion, issued a separate concurrence "to emphasize what seems ... to be the limited nature of the Court's holding." *Branzburg*, 408 U.S. at 709 (Powell, J., concurring).

> If a newsman believes that the grand jury investigation is not being conducted in good faith he is not without remedy. Indeed, if the newsman is called upon to give information bearing only a remote and tenuous relationship to the subject of the investigation, or if he has some other reason to believe that his testimony implicates confidential source relationship without a legitimate need of law enforcement, he will have access to the court on a motion to quash and an appropriate protective order may be entered. The asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with

7

> respect to criminal conduct. The balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions.

*Id.* at 710 (Powell, J., concurring).[6] The Ninth Circuit has state that, when "[r]ead together with the majority opinion," Justice Powell's concurrence

> must be understood to mean that where a grand jury inquiry is not conducted in good faith, or where the inquiry does not involve a legitimate need of law enforcement, or has only a remote and tenuous relationship to the subject of the investigation then, the balance of interests struck by the *Branzburg* majority may not be controlling. The balancing of interests suggested by Justice Powell is in the limited circumstances he mentioned, where there is, in effect, an abuse of the grand jury function.

*Scarce*, 5 F.3d at 401.

Here, Movants have neither argued nor demonstrated to the satisfaction of this Court that there has been any abuse of the grand jury process. First, there is no suggestion that the grand jury investigation into the leaks of the BALCO grand jury transcripts is being conducted in anything other than good faith. Second, as noted above, although Movants characterize this case as involving mere contempt, the Government has satisfied this Court that the grand jury is inquiring into matters that involve a legitimate need of law enforcement. Third, in light of the fact that Movants are the persons to whom the transcripts in question were leaked, the request for the information has neither a remote nor tenuous connection to the investigation. Rather, this information is central to the determination of whether the leaker(s) may or may not have committed perjury, may or may not have sought to obstruct justice, may or may not have

---

[6] The import of Justice Powell's concurrence has generated much debate among the federal courts. *See New York Times Co. v. Gonzales,* 382 F. Supp. 2d 457, 485-86 (S.D.N.Y. 2005) (discussing the varied characterizations of opinion and holdings), *vacated and remanded by Gonazales*, __ F.3d __, 2006 WL 3130645. The Ninth Circuit's views on the opinion have not been entirely consistent. *Compare Scarce*, 5 F.3d at 400 ("It is important to note that Justice White's opinion is *not* a plurality opinion.") (emphasis in original), *with Farr v. Pritchess*, 522 F.2d 464, 467 (stating that "Justice Powell was needed to obtain a plurality"). The Court concludes that any conflict between *Farr* and *Scarce* can be reconciled by the fact that, in each case, the courts suggest that *Branzburg* should be interpreted to hold that, with respect to a grand jury investigation conducted in good faith, any limited First Amendment privilege a reporter may hold will be subordinate to the grand jury's right to discover information pertinent to that investigation. *See Scarce*, 5 F.3d at 401; *Farr*, 522 F.2d at 467-68.

8

violated Federal Rule of Criminal Procedure 6(e), and may or may not have violated the provisions of the Protective Order.

Although Movants also argue that *Scarce* is not controlling because it involved a "scholar's privilege," Scarce himself analogized that privilege to a reporter's privilege. *Scarce*, 5 F.3d at 398. Further, the Ninth Circuit rejected his claim of privilege based on its view that if a reporter held no such privilege, neither would a scholar. *Id.* at 400 (noting that the Supreme Court in *Branzburg* "concluded ... that the First Amendment does not provide a news gatherer a privilege to refuse to testify before a federal grand jury regarding information received in confidence" and that the "circumstances of the present case fall squarely within those of *Branzburg*"). The Court finds the circumstances of the present case also fall squarely within the circumstances contemplated by *Branzburg* and *Scarce* and concludes that the First Amendment does not provide Movants with a basis to refuse to appear before the grand jury to answer questions and produce documents or objects requested in the subpoena. *See Branzburg*, 408 U.S. at 707-08; *Scarce*, 5 F.3d at 402.

Accordingly, the Court DENIES the motion to quash to the extent it rests on the assertion of a reporter's privilege grounded in the First Amendment.

**B.     The Movants Cannot Rely on A Common Law Reporter's Privilege to Resist the Subpoenas.**

Movants claim that "[w]hatever the law was in 1972 when Branzburg was decided, in the 34 years since Branzburg, much has changed." (Mot. at 19.) Accordingly, they urge the Court to apply three factors identified by the Supreme Court in *Jaffee v. Redmond*, 518 U.S. 1 (1996), which they contend support the recognition of a common law reporter's privilege under Federal Rule of Evidence 501 ("Rule 501").[7] Those three factors are (1) whether important private and public interests would be served by recognition of the privilege; (2) whether the evidentiary cost of recognizing the privilege is likely to be modest; and (3) whether similar

---

[7] In *Jaffee*, interpreting Federal Rule of Evidence 501, the Supreme Court recognized a federal common law privilege for communications between psychotherapists and their patients as well as a privilege for communications between social workers and their clients. *See Jaffee*, 501 U.S. at 15-16.

9

protections are afforded by the states, either through legislation or the common law. *See Jaffee*, 518 U.S. at 10-15. According to the Movants' argument, "[t]here is now an overwhelming consensus in this country that a reporter's privilege exists and must be given effect." (Mot. at 19.)

Movants are correct that a large number of states have recognized a reporter's privilege. However, federal courts generally have been reluctant to follow the lead of the states, in the context of grand jury proceedings. *See, e.g., Gonzales*, __ F.3d __, 2006 WL 3130645 at *7 (stating that "[i]t is unnecessary ... for us to rule on whether such a privilege exists under Rule 501" because "any such privilege would be a qualified one ... [and] would be overcome as a matter of law on these facts"); *In re Miller,* 438 F.3d at 1150 ("The Court is not of one mind on the existence of a common law privilege. Judge Sentelle would hold there is no such common law privilege[.] ... Judge Tatel would hold that there is such a common law privilege. Judge Henderson believes that we need not, and therefore should not, reach that question. However, all believe that if there is any such privilege, it is not absolute and may be overcome by an appropriate showing," and "that if such a privilege applies here, it has been overcome."); *In re Special Proceedings,* 373 F.3d at 44 (reading *Branzburg* to "flatly reject[] any notion of a general-purpose reporter's privilege for confidential sources, whether by virtue of the First Amendment or of a newly hewn common law privilege"); and *In re Special Counsel Investigation.*, 332 F. Supp. 2d at 32 (construing *Branzburg* to reject First Amendment and common law reporter's privilege in the grand jury context, and rejecting recognition of privilege under Rule 501). The exceptions appear to be *In re Williams*, 766 F. Supp. 358, 367 (W.D. Pa. 1991), *aff'd by equally divided court* 963 F.2d 567 (3rd Cir. 1992) (*en banc*) (recognizing qualified reporter's privilege under Rule 501 and concluding that government had not met its burden to overcome privilege) and *New York Times v. Gonzales*, 382 F. Supp. 2d 457, 492-508 (S.D.N.Y. 2005) (recognizing privilege under Rule 501), however, as noted, the latter opinion was subsequently vacated by the Second Circuit. *Gonzales*, __ F.3d __, 2006 WL 3130645 at *7.

Again, *Scarce* provides guidance to the Court with respect to the Ninth Circuit's views, and in that case the court rejected Scarce's argument that the scholar's privilege should be recognized under Rule 501. *Id.* at 402-03. In its analysis of the issue, the court cited to one of its earlier decisions, *Lewis v. United States*, 517 F.2d 236 (9th Cir. 1975) ("*Lewis II*"), and to *Branzburg* and concluded that "[i]t would be difficult to argue for a common law reporter's privilege to withhold confidential information from a federal grand jury in the face of this recent and authoritative statement that the general common law rejects such a privilege." *Id.* (quoting *Lewis II*, 517 F.2d at 238).

The *Scarce* court also acknowledged that some of its sister circuits had recognized a reporter's qualified privilege under the common law, but it distinguished those cases on the ground that they "did not involve grand jury inquiries." *Id.* at 403. The court also declined to follow *In re Williams*, *supra*, "on the ground that it directly conflicts with the Supreme Court's holding in *Branzburg.*" *Id.* Finally, the court stated that it did not read Rule 501 to "sanction[] the creation of privileges by federal courts in contradiction of the Supreme Court's mandate." *Id.* at 403 n.3. Thus, noting that "*Branzburg* cast doubt on our ability to recognize a news gathering privilege in the grand jury context as a matter of common law," the court concluded that "[w]e are no more inclined to undermine the specific mandate of *Branzburg* now, than we were when we" decided *Lewis II*. *Id.* at 402-03.

Although *Scarce* pre-dates *Jaffee*, and although the legal landscape within the states indeed may have changed since *Branzburg* was decided, the Ninth Circuit's position on the issue appears clear to this Court: unless and until the Supreme Court states that a common law reporter's privilege exists, or unless Congress enacts such a privilege, *Branzburg*'s mandate is binding. Accordingly, the Court declines Movants' invitation to apply the *Jaffee* factors and recognize a common law reporter's privilege under Rule 501. However, even if a reporter's privilege exists or should be recognized under the federal common law, the Court concludes that it would be overcome on the facts of this case.

Movants argue that in balancing the interests at stake here, the Court should begin with the standard adopted by the Ninth Circuit in *Shoen II*, 48 F.3d at 417 (requiring civil litigant

11

seeking non-confidential information to establish that the material requested is "(1) unavailable despite exhaustion of all reasonable alternative sources; (2) noncumulative; and (3) clearly relevant to an important issue in the case"). Movants also, however, ask the Court to engage in the balancing test articulated by Judge Tatel in the *Miller* case and to weigh "the public interest in compelling disclosure, measured by the harm the leak caused, against the public interest in newsgathering, measured by the leaked information's value." (Mot. at 38 (quoting *Miller*, 438 F.3d 1175 (Tatel, J., concurring).) The Court, however, reads the Supreme Court's opinion in *Branzburg* to counsel against relying on the type of balancing test advocated by Judge Tatel, which would require a court to make

> a value judgment that a legislature had declined to make, since in each case the criminal law involved would represent a considered judgment, not constitutionally suspect, of what conduct is liable to criminal prosecution. The task of judges, like other officials outside the legislative branch, is not to make the law but to uphold it in accordance with their oaths.

*Branzburg*, 408 U.S. at 706. The Court finds this reasoning to be equally applicable to a balancing test that would require it to place greater value on the reporting of certain news stories over others and, thus, declines to do so.

Therefore, applying only the *Shoen II* test, the Court is satisfied that the Government has established that it has exhausted all reasonable alternatives to discover the source of the leak absent Movants' testimony and production of documents. Before the grand jury in this case was even convened, the parties in the BALCO case submitted declarations to Judge Illston documenting their handling of the grand jury materials, and the Government has submitted waivers obtained from its employees as well as other materials tending to show they have exhausted all reasonable alternatives to obtain this information. (*See* Hershman Decl., Exs. AA, FF, GG and Hershman Reply Decl., Ex. 1.)[8] The Court also concludes that the Government has established that the testimony would not be cumulative in that it would appear

---

[8] Movants do not object to the Court considering Hershman reply declaration on an *ex parte* basis. *See, e.g., Miller*, 438 F.3d at 1150-51 (rejecting argument that consideration of *ex parte* submission from the government violated appellants' due process rights).

to be the only first-hand evidence of the identity or identities of the source or sources. Finally, the Court concludes that the Government has established that the testimony and documents requested by the grand jury are relevant to an important issue in the investigation. Indeed, they are the central to that investigation.

Accordingly, the Court DENIES the motion to quash to the extent it rests upon the assertion of a common law reporter's privilege.

**C.     Compliance With The Subpoenas Would Not Be Unreasonable or Oppressive.**

Movants' final argument in support of their motion to quash the subpoenas is grounded in Federal Rule of Criminal Procedure 17, which "confers discretion on the district court to quash a grand jury subpoena if compliance would be 'unreasonable or oppressive.'" *See In re Grand Jury Subpoena to Nancy Bergeson,* 425 F.3d 1221, 1224 (9th Cir. 1995) ("*Bergeson*"); Fed. R. Crim. P. 17(c)(2). "[A] grand jury subpoena issued through normal channels is presumed to be reasonable," and Movants bear the burden of establishing that compliance would be unreasonable or oppressive. *R. Enterprises*, 498 U.S. at 301. Movants argue that the subpoenas interfere with "the press' ability to fulfill its core First Amendment function of informing the public on matters of public concern ... [and] are destructive of the reporter's confidential source relationships," which in turn impinges on their livelihood. (Mot. at 47.) Thus, Movants again ask the Court to determine that, in the absence of a privilege, the interests in maintaining the free flow of information outweigh any interests the grand jury may have in obtaining the information requested.

Movants rely on *Bergeson*, a case involving an attorney called to testify before a grand jury about information she provided to her client. The district court concluded that the information was not privileged, but nonetheless quashed the subpoena because it found that if she testified, the relationship with her client would be destroyed. On appeal, the Ninth Circuit concluded that a court must evaluate a motion to quash a grand jury subpoena under Rule 17(c) on a case by case basis. 425 F.3d at 1227. Thus, the court stated that a "defendant is not automatically entitled to an order quashing such a subpoena merely because the government cannot show that no other source of testimony exists and that there is a compelling need for it

13

to obtain an indictment." *Id.* Yet, "[t]he government is not automatically entitled to subpoena a lawyer to testify against his client merely because the Constitution does not prohibit it and the material is not privileged." *Id.* Noting that a district court may consider such factors as whether the information is available from other sources and whether compliance would likely destroy the attorney-client relationship, the Ninth Circuit held that the district court did not abuse its discretion in quashing the subpoena. *See Bergeson*, 425 F.3d at 1225-26.

Here, Movants assert that their "professional standing and ability to continue their work – indeed, their livelihood – rests on their ability to live up to their promises to whistle-blowers," and, thus, argue that compliance with the subpoena would be oppressive because it would destroy "a confidential relationship by forcing reporters to testify about their sources." (Mot. at 50.) Movants do not contend that any particular source relationship will be destroyed. In *Bergeson*, however, there was a specific and particular relationship that was threatened, *i.e.* the relationship between Bergeson and her client as a defendant. Movants' generalized assertions therefore do not comport with *Bergeson*'s teaching that a court must look at the facts of each particular case and do not satisfy their burden of showing compliance in this case is unreasonable or oppressive. Further, to the extent the Court may consider the need for Movants' testimony, because the grand jury is entitled to "inquire into all information that might possibly bear on its investigation until it has identified an offense or has satisfied itself that none has occurred," *R. Enterprises*, 498 U.S. at 297 (citations omitted), for the reasons set forth above in Section B, the Court finds that Movants have not established that compliance would be unreasonable or oppressive. Accordingly, notwithstanding the First Amendment interests that are implicated in this case, Movants have not met their burden to show that the subpoenas should be quashed pursuant to Rule 17(c)(2).

Accordingly, the motion to quash is DENIED on this basis as well.[9]

---

[9] Movants also assert that the Court should grant the motion because under Department of Justice Guidelines, subpoenas like those at issue here should be issued only in exigent circumstances. (Mot. at 44, citing 28 C.F.R. 50.10(f)(4) and U.S. Attorneys' Manual, title 9, Section 13.400.). The Court DENIES the motion on this basis because those regulations do not provide Movants with any enforceable rights. Moreover, to the extent compliance bears on the question of whether the subpoenas are unreasonable or oppressive,

14

**CONCLUSION**

For the reasons set forth in this Order, the motion to quash the subpoenas is DENIED. Movants are HEREBY ORDERED to appear before the grand jury at a date and time to be determined by the Government to answer questions posed to them and to produce all documents or objects requested in the subpoenas.

**IT IS SO ORDERED.**

Dated: August 15, 2006

                                              JEFFREY S. WHITE
                                              UNITED STATES DISTRICT JUDGE

---

the Court finds that the Government has complied with the regulations it must follow to obtain authorization for the issuance of the subpoenas.